### BURKE et al. v. HORTH et al.

(Circuit Court of Appeals, Eighth Circuit. March 4, 1926.)

No. 6828.

I. **Mines and minerals** &#8658;73—**Lessee under oil and gas lease from one holding under mineral location claim acquires no greater right than that held by lessor.**

Lessee under oil and gas mining lease from lessor holding under mineral location claim acquires no greater estate than that held by lessor.

2. **Mines and minerals** &#8658;78(2)—**Failure of lessee under oil lease requiring wells to be drilled to meet requirements of such covenants, so as to constitute abandonment, terminates all rights under lease.**

Failure of lessee under fifty-year oil and gas mining lease to meet requirements of covenants to commence well and continue it until completion, and to commence additional wells, under such facts as would constitute abandonment, would terminate all rights under lease.

3. **Mines and minerals** &#8658;5—**Finding that assignees of oil and gas lease had abandoned lease, and that all rights thereunder terminated as against those of subsequent lessees, and as to interest in lease issued by Department of the Interior, held supported by evidence (Leasing Act Feb. 25, 1920 [Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss]).**

Finding that assignees of oil and gas lease from holder under original mineral location had abandoned their lease, and that all rights thereunder in their favor had terminated, as against rights of subsequent lessees, and as to interest in lease issued by Department of the Interior under Leasing Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss), *held* supported by evidence.

Appeal from the District Court of the United States for the District of Wyoming; T. Blake Kennedy, Judge.

Suit by M. B. Burke and another against Robert Taylor, who died after the trial of the cause had started, but before it was completed, and whose executor, Ralph R. Horth, was substituted as defendant, and wherein the Columbine Oil Company and another were intervening defendants. From a decree dismissing the bill (296 F. 256), plaintiffs appeal. Affirmed.

See, also, 293 F. 408.

N. E. Corthell, of Laramie, Wyo., and John R. Smith, of Denver, Colo. (George E. Brimmer, of Cheyenne, Wyo., on the brief), for appellants.

A. C. Campbell, of Cheyenne, Wyo. (Roderick N. Matson, of Cheyenne, Wyo., Merle N. Poe, of Findlay, Ohio, and A. M. Gee, of Casper, Wyo., on the brief), for appellees.

Before STONE and VAN VALKENBURGH, Circuit Judges, and WILLIAMS, District Judge.

WILLIAMS, District Judge. The appellants, M. B. Burke and Eclipse Oil Company, claim through an oil and gas mining lease covering 320 acres in the Salt Creek oil field of Wyoming, executed on November 21, 1911, to J. Condit Smith, lessee, by appellee Ralph R. Horth's testate, Robert Taylor, then holder under original mineral location. On September 23, 1916, said Tay-

lor executed another oil and gas mining lease to R. J. Mosher as lessee, for same 320-acre tract, who sublet by assignment to appellee Columbine Oil Company, which in turn again sublet by assignment of an interest therein to appellee Ohio Oil Company. On June 21, 1920, the Department of the Interior issued to said Robert Taylor an oil and gas mining lease on said land under Leasing Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ss).

Appellants in the trial court sought to have lease of November 21, 1911, decreed to be in full force as against said Robert Taylor and all parties claiming or to claim under him, and protected by Leasing Act Feb. 25, 1920, and subsequent lease from Taylor to Mosher, and assignments to sublessees, Columbine Oil Company and Ohio Oil Company, canceled, and that Taylor be required to deliver or cause to be delivered to them an approved assignment of a seven-eighths interest in lease of June 21, 1920. The trial court held that appellants' lease did not constitute a conveyance of a vested estate, but only a right or permit to enter to acquire a vested estate by development, and further found that such development had never been made, and that appellants abandoned same. The bill was dismissed on its merits.

1. In Black v. Elkhorn Mining Co., 163 U. S. 448, 16 S. Ct. 1102, 41 L. Ed. 221, it is said:

"By section 2324 [Revised Statutes; Comp. St. § 4620] certain conditions are imposed upon locators, upon a failure to comply with which the claim is rendered open to a relocation the same as if never before located. One of the conditions is the following: 'On each claim located after the tenth day of May, eighteen hundred and seventy-two, *and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year.'* [Italics mine.] * * * It has been held that this character of interest thus outlined is property, and it is recognized as such in those states of the West whose inhabitants are interested in mines. These claims are subjects of bargain and sale, and constitute, as it is said, very largely the wealth of the Pacific Coast states, and the right to sell, transfer, mortgage and inherit them is recognized by the courts. * * *

"Mr. Justice Miller, in the course of his opinion in Forbes v. Gracey [94 U. S. 762, 24 L. Ed. 313], stated: 'It is very true that Congress has, by statutes and by tacit consent, permitted individuals and corporations to dig out and convert to their own use the ores containing the precious metals which are found in the lands belonging to the government, without exacting or receiving any compensation for those ores, and without requiring the miner to buy or pay for the land. It has gone further, and recognized the possessory rights of these miners, as asserted among themselves by the rules which have become the laws of the mining districts as regards mining claims; * * * but in doing this it has not parted with the title to the land, except in cases where the land has been sold in accordance with the provisions of the law upon that subject.' The interest in a mining claim, prior to the payment of any money for the granting of a patent for the land, is nothing more than a right to the exclusive possession of the land based upon conditions subsequent, a failure to fulfill which forfeits the locator's interest in the claim. We do not think that under the federal statute the locator takes such an estate in the claim that dower attaches to it.

"To sum up as to the character of the right which is granted by the United States to a locator, we find: (1) That no written instrument is necessary to create it. *Locating upon the land and continuing yearly to do the work provided for by the statute* [italics mine] gives to and continues in the locator the right of possession as stated in the statute. (2) This right, *conditional in its character, may be forfeited by the failure of the locator to do the necessary amount of work* [italics mine], or if, being one among several locators, he neglects to pay his share for the work which has been done by his co-owners, his right and interest in the claim may be forfeited to such co-owners under the provisions of the statute. (3) His interest in the claim may also be forfeited by his abandonment, with an intention to renounce his right of possession. It cannot be doubted that an actual abandonment of possession by a locator of a mining claim, such as would work an abandonment of any other easement, would terminate all the right of possession which the locator then had."

Act June 25, 1910 (36 U. S. Stat. p. 847, c. 421) authorizes the President within his discretion to temporarily withdraw from settlement, location, sale, or entry any of the public lands, with a proviso in section 2 that all lands so withdrawn "shall at all times be open to exploration, discovery, occupation, and purchase, under the mining

laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates: Provided, that the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is a bona fide occupant or claimant of oil or gas bearing lands, and who, at such date, is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work: And provided further, that this act shall not be construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after any withdrawal of such lands made prior to the passage of this act."

[1] Whatever rights appellants have were derived intermediately through said J. Condit Smith, to whom testate Robert Taylor on November 21, 1911, who then held under a mineral location claim made prior to the year 1909, gave a 50-year oil and gas mining lease, "granting, demising, leasing, and letting * * * in consideration of the sum of one dollar and other valuable considerations, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be kept and performed." Under said covenants said Smith, or his assign, was obligated among other things to commence a well on or before June 15, 1912, and to continue same with proper diligence until completed; to commence additional wells within 60 days after completion of each well until each quarter section had been drilled or developed for oil and gas; and to deliver a royalty of one-eighth of gross production of said oil and gas to said lessor. Taylor was not to sell, dispose of, or incumber his rights on said premises without affording lessee first privilege of purchasing same, and in event of discovery of oil or gas in paying quantities was immediately to proceed to make application for patent. The lessee did not acquire any greater estate by such demise than that held by such lessor. It is not essential here to determine the extent of such estate. However, for the purpose of disposing of this appeal, it is assumed that the lease passed to the lessee, his heirs and assigns, a present vested right or interest—freehold interest or estate.

[2] 2. Failure of said lessee Smith or his assigns to meet requirements of such covenants under a proper state of facts as to abandonment would terminate all rights under said lease. Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co., 126 F. 623, 61 C. C. A. 359; Brewster v. Lanyon Zinc Co., 140 F. 801, 72 C. C. A. 213; Paine v. Griffiths, 86 F. 453, 30 C. C. A. 182; and Guffey v. Smith, 237 U. S. 116, 35 S. Ct. 526, 59 L. Ed. 856, and authorities cited in footnote 1.

In summer of 1912 appellants through joint adventure with Denver-Wyoming Oil Company and Eclipse Oil Company, at an expense of some $10,000, the former company furnishing two-thirds of that amount, drilled a well on said land to first Wall Creek sand. At a depth of 1,550 feet, encountering water, deeper drilling was impracticable or inexpedient. At about 800 feet a showing of oil was obtained, which, according to appellants' evidence, was estimated at about 25 barrels per day, but was in fact only sufficient to stain tools and equipment. It is a significant fact that Eclipse Oil Company, superintending the drilling and jointly interested with Denver-Wyoming Oil Company, never informed it that oil had been found nor any effort made to preserve it. Notwithstanding covenants on part of Smith, through whom appellants claim, to meet all requirements as to assessment work and development as to oil and gas with due diligence, after work on this first well was discontinued—all drilling and assessment work thereon having ceased—appellants immediately pulled the casing, dismantled the rig, and vacated said premises, taking therefrom everything connected with their oil and gas development or improvement work thereon, and during the period intervening between 1912 and 1920 neither made any assessment work nor oil or gas development upon nor in any way occupied said tract of land constructively or otherwise, or asserted any claim under said lease until about the time of passage of Act Feb. 25, 1920.

Immediately after such vacation of said premises appellants began exploring under other leases adjacent to or in immediate neighborhood thereof, where oil and gas development appeared to be more desirable, and continued same into the year 1913, until appellant Eclipse Oil Company, through which appellant Burke and his associates operated, became involved in financial difficulties, and all its assets and properties including such equipment were seized and sold under attachment or execution at instance of creditors, when every officer and agent withdrew or removed from the state, making no apparent effort to save such

property for other development, and leaving no one in charge to protect any remaining interest, and passing out of business as a going concern; but the legal existence of the corporation remained, no steps being taken for its dissolution. After 1912 all assessment work continuing through 1914 and 1915 to keep original mining location alive was done by Robert Taylor, through R. J. Mosher; no other oil or gas development being done until after September 27, 1916, when two paying oil wells were drilled by the appellees Columbine Oil Company and Ohio Oil Company under the Mosher lease at an expense of over $40,000; one a shale well 1,030 feet deep, producing 20 barrels per day, and another to second Wall Creek sand, producing 200 barrels per day.

During this period of development appellant Burke and his associates saw said lessees of Taylor under said second lease upon said premises engaged in oil and gas development work, without making any inquiry of said parties as to their right to possession, or as to the authority under which such development was being made, or informing them as to any existing adverse claim. If Burke and his associates had not totally abandoned all claim under original lease, or entertained any purpose or intention to continue to claim said mineral location for development for oil and gas purposes, why was not such claim then and there asserted? True, appellants claim that they had an arrangement by parol with testate, Robert Taylor, by which he indefinitely released them from the covenants under said lease, not only as to assessment work, but also oil and gas development.

The evidence given by Smith and Burke in this respect as to their recollection of such agreement claimed to have been made in a conversation with Taylor in July or August, 1912, does not harmonize. Smith testified that Burke and Taylor and himself "discussed the effect of the government's attack on the titles, and it was agreed we should wait and see what was the outcome of the suits that were already started or were to be started. We were afraid of our titles, except on ground where actual discoveries had been made, and Taylor said he did not know personally of any discoveries having been made. * * * Burke asked Taylor if he would see about discoveries, and apply for a patent under our discoveries, as we wanted to get our titles straightened out. Taylor said he was willing, but under the circumstances, having our title attacked, thought it best not to, but to wait and see whether or not

he could get a good title, if he applied for one, and that no one seemed to know just at that time where we were all at, and that the best thing to do would be to wait and see what developed, and not apply for a title, and at the same time he told us we could hold up on our work of drilling."

Burke testified as follows as to the same conversation: "Taylor said it cost a great deal of money to apply for patent, and his titles were shaky, and the ground had been withdrawn, and he did not think it was the right thing to do at that time. I said to Taylor that we had just gotten from Mr. Hanley a contract showing that we had complied with our drilling requirements, * * * and we would like to have the same thing from him under the circumstances, or until we could get some relief either by getting a patent, or the government giving us relief in some way. I think it wound up by Mr. Taylor saying that he would take the matter up with his attorney, and let us know later what he would do, but that he would give us the relief that Hanley had given us, or similar relief—that he was going to either apply for a patent, or give us a drilling release, the same as Hanley gave us."

[3] Taylor, in attendance at the trial whilst this evidence was being given, on account of his sudden illness and death before the trial was completed, did not testify. Though we are not permitted to surmise as to what it would have been, there are facts and circumstances running through this record which render such evidence as given on the part of Smith and Burke improbable. Under Smith's recollection, Taylor agreed that they could suspend drilling; and under Burke's, Taylor was to give them a written release, similar to that which they had received from Hanley, reciting that they had completed their drilling work, but which in fact was never executed. The annual assessment work was not mentioned in this purported conversation. If oil and gas exploration was not performed until actual discovery was made, annual assessment work must be done in order to preserve said mineral location. The oil and gas mining lease of November 21, 1911, was to run for a period of 50 years, and Taylor's right to a patent depended on an actual discovery or his right to hold such location could be preserved only by continued performance of assessment work. Neither Burke nor Smith testified as to any specific understanding as to any future or continued de-

velopment as to oil or gas or any assessment work under said lease.

Appellants had made no actual discovery of oil or gas in paying quantities, so annual assessment work must be and was continued by Taylor, through Mosher, at his own expense, in order to preserve said claim or location. The lease of November 21, 1911, was entered into about two years after issuance in 1909 of first presidential proclamation or withdrawal order, and nearly a year after second of such orders, about January 1, 1911. The suit by the United States against the Mid-West Company to test validity of such withdrawal orders was not begun until February 14, 1913. Reasons assigned by appellants for ceasing development, and vacating premises, and removing therefrom everything which they had thereon, on account of general uncertainty of titles then existing in that district, occasioned by presidential orders, is not consistent with entering into of the lease of November 21, 1911, in face of said orders, and, after bringing in the dry hole on the Taylor lease, immediately going on nearby tracts open to same objection and uncertainty, on account of being under ban of same orders, and without any delay beginning development of such tracts.

Would it have been reasonable for Taylor to have assumed all burden of assessment work for an indefinite period, and release appellants indefinitely from their covenant requirements, including, not only annual assessment work, but also diligent development for oil and gas, under said oil and gas mining lease of November 21, 1911, which was to run for 50 years, with no provisions made or means provided for his reimbursement? Acts and circumstances proving abandonment by appellants have not been satisfactorily explained. Conduct of testate Taylor does not harmonize with theory of appellants. His giving of second lease on September 23, 1916, to Mosher, with immediate development thereunder, which coming to attention of representatives of appellants, no complaint or warning as to any adverse claim was made on their part to parties actually making such development.

Taylor's antagonism to appellants' claim, although he would have derived greater benefit under lease of November 21, 1911, than that of June 21, 1920, the former providing for him a royalty of one-eighth, and latter, by an arrangement with appellees Columbine Oil Company and Ohio Oil Company, a one-tenth working interest, is obvious. The interest open to him from each lease was called to his attention by Smith, either with a view of neutralizing his opposition or removing conflicting evidence on his part. Considering all facts, acts and circumstances in connection with conduct of appellants and their intermediary, J. Condit Smith, during period beginning in the first part of 1912 and extending to early part of 1920, which are at variance with any present existing good faith claim under said lease of November 21, 1911, after close of year 1912, the conclusion reached by the trial court that, appellants having abandoned their lease, all rights thereto and thereunder in their favor had terminated, is amply supported by evidence in the record, and the decree of the trial court is

Affirmed.